IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LARRY DIXON,

        Petitioner,

  v.

D.L. RUNNELS, Warden,

        Respondent.

_____/

No. 04-3038(PR) CW

ORDER DENYING
PETITION FOR WRIT
OF HABEAS CORPUS

On July 27, 2004, Petitioner Larry Dixon filed his petition for a writ of habeas corpus to vacate his June 19, 1999 conviction for the first degree murder of his wife. On February 28, 2005, Respondent filed an answer and on May 2, 2005, Petitioner filed a traverse. On March 7, 2006, the Court granted Petitioner's request to expand the record to include evidence in support of his claim of perjured testimony. In granting Petitioner's motion, the Court recognized that the new evidence would also support a claim pursuant to Brady v. Maryland, 373 U.S. 83, 87 (1963), and noted that a Brady claim was not included in Petitioner's federal or state petitions and, therefore, it was unexhausted. Petitioner moved for a stay and abeyance of his petition during the time he exhausted this claim, which the Court granted. On September 25, 2007, after Petitioner exhausted his Brady claim, the Court granted Petitioner's motion to reopen the case, lift the stay and file a supplemental petition. Respondent filed an answer to the supplemental petition and Petitioner filed a supplemental traverse.

United States District Court
For the Northern District of California

On March 18, 2008, Petitioner filed a motion to shorten time for the Court to rule on his petition.

Having read all the papers filed by the parties and the state court trial record, the Court DENIES the petition and DENIES the motion to shorten time as moot.

BACKGROUND

On July 15, 1999, a jury convicted Petitioner of the first degree murder of his wife Debra Gaines and found that the deadly weapon and great bodily injury enhancements were true.  The trial court found that Petitioner had a prior conviction and a prior prison term and sentenced him to a term of fifty-seven years to life.

The state court of appeal found the following facts underlying Petitioner's murder conviction.

> The prosecution's case included the following evidence. Appellant lived with his wife, Debra "Dimples" Gaines, and her two children by a previous marriage, Melvin Earl Gaines and Melvishia Gaines, in Ms. Gaines's East Palo Alto home.  The family also shared the house with several persons who rented the downstairs rooms: Narvella Gaines, Ms. Gaines's former sister-in-law, Andy Downs, his girlfriend Phyllis Lewis, and their daughter, and James Arnold.
>
> After appellant and Ms. Gaines were married in 1995, Melvin and Melvishia started to notice that things were disappearing from the house, such as CD players, amplifiers, a VCR, a camcorder, some clothes, a bicycle, and a lawn mower.  Appellant acknowledged to Melvin that he had taken the boy's CD player . . . .
>
> Melvin and Melvishia heard numerous arguments between appellant and Ms. Gaines . . . . Tenants Downs and Lewis also heard appellant and Ms. Gaines arguing late at night. . . .
>
> By the end of 1997, appellant and Ms. Gaines were arguing more and more often, several times a week.  Most of their arguments occurred when he had been drinking.

2

Ms. Gaines told her children and several others that she planned to divorce appellant . . .

Henry Butler and his wife were close friends of Ms. Gaines.  Butler became acquainted with appellant after he married Ms. Gaines, and the two men often got together to drink and talk.  Toward the end of 1997, appellant told Butler he was having problems; he thought Ms. Gaines was "messing around on him," having affairs with other men.  Appellant was very angry about it.  He said that he was going to kill her and that he ought to go cut her throat.  He was also angry because he didn't have any money and wanted to get high; Ms. Gaines had all the money and wouldn't give him any.  Butler acknowledged that he had been smoking cocaine when he had these conversations with appellant.

On December 31, 1997, Ms. Gaines's former husband came to the East Palo Alto residence late in the afternoon to pick up his children, as they were going to spend the holiday night with him. . . .

Tenant James Arnold was in his room on New Year's Eve.  From his window, he could see the outside stairs that led to the second floor balcony.  He noticed appellant going up and down those stairs several times between 8:00 and 10:00 p.m.  Arnold acknowledged that at the time he had been drinking rum and was "pretty well toasted."  Arnold also saw appellant going up and down the stairs several times on New Year's Day.

Narvella Gaines spent New Year's Day at home.  She did not see Ms. Gaines, although the latter's car was in the driveway.  At about 9:00 p.m., while Narvella was watching television in the upstairs family room, appellant came into the house through the second floor balcony door and asked, "Where's my wife?"  He told Narvella, "We got into an argument.  She went her way, I went my way."  Then he left.

Meanwhile, Melvin and Melvishia had returned home on New Year's Day at around 2:00 p.m. because Melvishia had to go to work.  They both went into their mother's room briefly to get something; the room was messy, which was not unusual.  Neither saw their mother.  Melvin noticed that the bedding was "balled up."  Melvin went to a friend's, returned home, and then went to a teen club.  He came home at about 12:30 a.m. on January 2.  When his pager went off, he went into his mother's bedroom to look for the portable phone, and he discovered her body on the floor hidden under the bedding.

Ms. Gaines had been stabbed 28 times.  She suffered three

3

fatal wounds, one to the jugular vein, one to the heart, and one to the lung.  She had numerous other stab wounds, including several defense wounds on her forearm and hand. The pathologist estimated that she had died sometime between 18 and 30 hours before the body was discovered.

On the morning of January 2, Freeman Owens was fishing from the old Dumbarton Bridge pier.  A white car drove up and parked.  The driver, who looked like appellant, got out, walked past Owens, and jumped off the bridge.  He landed in the water, but it was only waist deep.  He walked out of the water and said to Owens, "It's a damn shame that I can't kill my  . . . self."  He returned to his car and drove away.

Later that morning, appellant was stopped in his vehicle and arrested on a parole violation.  He was soaking wet and had a large scratch on the right side of his face. During an interview at the police station, he said he was wet because he had been sitting on the bridge and had fallen off.  He said that the last time he had seen his wife was at his mother's house on December 31. . . .

A DNA expert testified about various blood stains found at the Gaines residence, in appellant's car, and on Ms. Gaines's fingernail clippings.  He testified that the DNA of blood on a blue shirt found in the bedroom was consistent with that of both Ms. Gaines and appellant. Appellant could not be excluded as a possible donor of DNA in one of the blood stains on a towel found in the bathroom, and Ms. Gaines could not have been a donor of that stain.  Appellant also could not be excluded as a contributor of the material on the fingernail clippings.

Northern Tyler met appellant in February 1998 while both were in custody at the county jail.  They had several conversations.  Appellant told Tyler how he had killed his wife.  According to Tyler, appellant said he was "kind of upset with this lady because she had control over the money and they got into an argument, and they escalated from there."  Appellant told Tyler that his wife "fought for her life, struggling, trying to scratch him, and then in a panic, he basically stuffed her under the bed to make it look like the situation was a burglary or whatever, and cleaned up the situation and got out."

The prosecution also introduced evidence of prior acts of domestic violence by appellant . . .

Appellant testified in his own defense.  He said he had never caused any harm to Ms. Gaines.  He last saw his wife at about 9:00 p.m. on New Year's Eve; she and Narvella were eating chicken in the kitchen.  He didn't

4

want to spend any time with her because she was "cranky."
After he left the house, he was "ripping and running down
the streets," just "drinking" and "hitting stops, you
know, whatever."

Respondent's Ex. C. at 2-5.

LEGAL STANDARD

A federal court may entertain a habeas petition from a state
prisoner "only on the ground that he is in custody in violation of
the Constitution or laws or treaties of the United States."  28
U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death
Penalty Act (AEDPA), a district court may not grant a petition
challenging a State conviction or sentence on the basis of a claim
that was reviewed on the merits in state court unless the state
court's adjudication of the claim: "(1) resulted in a decision that
was contrary to, or involved an unreasonable application of,
clearly established federal law, as determined by the Supreme Court
of the United States; or (2) resulted in a decision that was based
on an unreasonable determination of the facts in light of the
evidence presented in the State court proceeding."  28 U.S.C.
§ 2254(d).  A decision is contrary to clearly established federal
law if it fails to apply the correct controlling authority, or if
it applies the controlling authority to a case involving facts
materially indistinguishable from those in a controlling case, but
nonetheless reaches a different result.  Clark v. Murphy, 331 F.3d
1062, 1067 (9th. Cir. 2003).

An unreasonable determination of the facts occurs where the
state court fails to consider and weigh highly probative, relevant
evidence, central to the petitioner's claim, that was properly

5

1  presented and made part of the state court record.  Taylor v.

2  Maddox, 366 F.3d 992, 1005 (9th Cir. 2004).

3       Even if the state court's ruling is contrary to or an

4  unreasonable application of Supreme Court precedent, that error

5  justifies habeas relief only if the error resulted in "actual

6  prejudice."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

7       The only definitive source of clearly established federal law

8  under 28 U.S.C. § 2254(d) is the holdings of the Supreme Court as

9  of the time of the relevant state court decision.  Williams v.

10  Taylor, 529 U.S. 362, 412 (2000).

11       To determine whether the state court's decision is contrary

12  to, or involved an unreasonable application of, clearly established

13  law, a federal court looks to the decision of the highest state

14  court that addressed the merits of a petitioner's claim in a

15  reasoned decision.  LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th

16  Cir. 2000).  If the state court only considered state law, the

17  federal court must ask whether state law, as explained by the state

18  court, is "contrary to" clearly established governing federal law.

19  Lockhart v. Terhune, 250 F.3d 1223, 1230  (9th Cir. 2001).

20                            DISCUSSION

21  I. State Court's Admission of Other Domestic Violence Crimes

22       Petitioner presents a facial and as-applied due process

23  challenge to California Evidence Code § 1109, which allows the

24  admission of evidence of prior acts of domestic violence in a

25  criminal action in which the defendant is accused of domestic

26  violence, so long as the evidence is admissible under California

27  Evidence Code § 352, which requires excluding evidence where its

28                                6

probative value is substantially outweighed by the possibility that it will consume an undue amount of time or create a substantial danger of undue prejudice or confusion.  Section 1109 changed the general rule that character evidence is inadmissible to prove a defendant's conduct on a specified occasion.  <u>See</u> Cal. Code Evid. § 1101; <u>People v. Falsetta</u>, 21 Cal. 4th 903, 911 (1999). Petitioner also argues his equal protection rights were violated by the trial court's admission of prior acts of domestic violence.

A. State Court's Opinion

The state appellate court addressed this claim as follows.

A. Introduction

Before trial, the court held a hearing on the prosecutor's request to present evidence about several prior acts of domestic violence by appellant against his former girlfriend, Maria Mabanag, and his ex-wife, Mary Bowen.  The prosecutor's request included an offer of proof as to the evidence he intended to present at trial about appellant and Ms. Gaines, and both Mabanag and Bowen testified at the hearing.  The court ruled that the evidence of all but one of the prior acts was admissible under sections 1109 and 1101.

At trial Mabanag testified that she had lived with appellant off and on for several years in the 1980s; they had a child together.  They drank and used cocaine and fought frequently.  When appellant drank, he became mean and angry if he didn't get his way; he would beat her with his fists and slap her. . . .

Sometimes they fought over money; sometimes they fought because he accused her of "messing around" on him.  In January 1986, when she was pregnant, he accused her of having sex with someone else, and he started hitting and slapping her.  She fled and called the police. . . .

The fighting continued after the baby was born.  In January 1987, appellant arrived at her residence, drunk. When she refused to let him in, he broke a window and forced his way inside by breaking a door knob.  She tried to call the police but he yanked the phone cord from the wall.  She started to hit him with a hammer.  He grabbed it, pushed her down, and started hitting her. . . .

Mary Bowen testified that she married appellant in 1992 and divorced him in 1994.  They argued throughout their marriage, especially when he drank.  He regularly accused her of involvement with another man.  They argued even more often over his requests for money.  When she would not give him her money, he would become very upset and violent. . . .

The arguments over money and other men continued, and things kept disappearing from the house.  One night, he was not at home when she locked the door and went to bed.  She woke up and found him standing at the foot of the bed with a knife in his hand, looking at her.  He left without saying anything. . . .

B. Discussion

Broadly stated, section 1109 allows admission in domestic violence cases of evidence that the defendant committed other acts of domestic violence, unless excluded under section 352.  Appellant attacks the constitutionality of section 1109, but his arguments are unavailing.

In People v. Falsetta (1999) 21 Cal. 4th 903, the Supreme Court rejected a due process challenge to a parallel statute, section 1108, which permits admission of a defendant's prior sex offenses in a sex offense case, subject to the limitations of section 352.  (Falsetta, at 916-922.)  The Courts of Appeal have consistently applied Falsetta to reject claims that section 1109 violates due process, and we agree with their conclusions.  It is unnecessary to reiterate the analysis in each of these cases; suffice it to say that they are dispositive of appellant's due process claim.  Appellant's equal protection challenge to the statute also is without merit.  (citations omitted).

Appellant argues in the alternative that the trial court abused its discretion under section 352 by failing to limit the evidence about his prior acts of domestic violence, but we do not agree.  A reviewing court will not disturb the trial court's exercise of discretion under that section except on a showing that the lower court acted in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.  (citations omitted).

The trial court in the present case articulated a detailed explanation of its reasons for admitting the prior domestic violence evidence.  It began by discussing the requirements of section 1109 and acknowledging its obligation to engage in the weighing process mandated by section 352.  It commented on the similarity of

8

appellant's conduct toward Bowen and Mabanag: his
intoxication, his violent use of the hands and feet, his
threats to kill, his accusations that the women were with
other men, and his infliction of violence when the women
would not give him money.

Turning specifically to Bowen's testimony, the court
mentioned appellant's threats to kill her, his appearance
in her bedroom with a knife, and his beating of her when
she did not give him money.  The court characterized her
testimony as highly probative because it demonstrated
that appellant engages in violent conduct toward his
spouse when he is angered or does not get something he
wants from that spouse, such as money.  The court
explicitly declared that the probative value of that
evidence "substantially outweighed" any prejudice.

With respect to Mabanag's testimony, the court again
emphasized the similarities between appellant's prior
conduct and that described in the prosecutor's offer of
proof. . . . [and] explicitly concluded that the
probative value of Mabanag's testimony substantially
outweighed any prejudice, and that allowing its admission
would be in the interest of justice.

The court's careful explanation of its reasons for
admitting the prior domestic violence evidence
demonstrates both that it understood the requirements and
limitations of section 1109 and that its ruling was well
within its discretion under section 352.  Although there
was no direct evidence that appellant regularly beat Ms.
Gaines during their marriage, there were striking
similarities between several aspects of the prior conduct
and that in the present case, such as appellant's anger
toward his partner when refused money, the link between
his consumption of alcohol and his anger, his accusations
of spousal infidelity, and his threats of violence.
Appellant's consistent pattern of abuse of his domestic
partners was unmistakable, and the trial court could
reasonably conclude that the high probative value of the
incidents described by Bowen and Mabanag substantially
outweighed any prejudicial impact from any or all of
their testimony.  Appellant has not demonstrated any
abuse of discretion.

Respondent's Ex. C. at 5-10.

B. Applicable Federal Law

The admission of evidence is not subject to federal habeas
review unless a specific constitutional guarantee is violated or

9

the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. <u>Henry v. Kernan</u>, 197 F.3d 1021, 1031 (9th Cir. 1999). The due process inquiry on federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. <u>Walters v. Maass</u>, 45 F.3d 1355, 1357 (9th Cir. 1995). Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 920 (9th Cir. 1991).

The United States Supreme Court has left open the question of whether admission of propensity evidence violates due process. <u>Estelle v. McGuire</u>, 502 U.S. 62, 75 n. 5 (1991). The Ninth Circuit has held that a petitioner's due process right concerning the admission of propensity evidence is not clearly established as required by AEDPA based upon the Supreme Court's reservation of this issue as an "open question" in <u>Estelle</u>. <u>Alberni v. McDaniel</u>, 458 F.3d 860, 866-67 (9th Cir. 2006). However, the Ninth Circuit has held that Federal Rule of Evidence 414,[1] which allows evidence of prior sexual offenses to show a propensity to commit the charged sexual offense, does not violate due process because the evidence is still subject to the trial court's balancing test which provides for meaningful review. <u>United States v. LeMay</u>, 260 F.3d 1018, 1031 (9th Cir. 2001).

---

[1] Rule 414 changed the general rule of evidence which disallows admission of a defendant's prior crimes or acts to prove character and makes such evidence admissible with respect to child molestation cases.

10

C. Analysis

Petitioner argues that this Court must conduct an independent review of the trial court's analysis because he has raised important constitutional issues.  However, Petitioner ignores AEDPA and the deferential standard it established for federal habeas review of state criminal proceedings.  This Court, therefore, must follow AEDPA and engage in the deferential review it requires.

Because the United States Supreme Court explicitly reserved the issue of whether admission of propensity evidence is unconstitutional, a habeas petitioner cannot show, as is required by AEDPA, that a state court unreasonably applied established federal law by concluding that an evidentiary rule allowing propensity evidence is constitutional.  Thus, Petitioner's claim that California Evidence Code § 1109 is unconstitutional on its face fails because there is no Supreme Court authority holding that the admission of propensity evidence violates due process.

Petitioner's citation to other Supreme Court cases is unavailing.  In <u>Michelson v. United States</u>, 335 U.S. 469 (1948) (approving state evidence rule regarding proof of reputation in criminal proceeding) and <u>Greer v. United States</u>, 245 U.S. 559, 561 (1918) (concluding there is no presumption that a criminal defendant is a person of good character), the Supreme Court merely addressed general rules regarding character evidence.  In <u>Spencer v. Texas</u>, 385 U.S. 554, 559, 569 (1967), the Court held that Texas statutes allowing evidence of prior convictions in a criminal trial did not deprive defendants of due process.  Thus, <u>Spencer</u> is contrary to Petitioner's argument and supports the conclusion that

11

the state court's ruling in Petitioner's case was not unreasonable.

In support of his as-applied constitutional challenge, Petitioner cites McKinney v. Rees, 993 F.2d 1378, 1386 (9th Cir. 1993), in which the Ninth Circuit held that the admission at trial of other acts evidence violated the habeas petitioner's due process rights. The McKinney court engaged in a two-step process to decide whether the admitted evidence violated due process: was the evidence relevant to an essential element in the prosecution's case, and, if not, did its admission render the petitioner's trial fundamentally unfair. In determining whether the evidence was relevant, the court noted that "evidence is considered irrelevant if it fails to make any fact of consequence more or less probable." Id. at 1380.

Here, the state appellate court found that the trial court properly analyzed, under § 352, whether the probative value of the proffered evidence outweighed its prejudicial effect. The appellate court found that the trial court specifically mentioned portions of the witnesses' testimony demonstrating that Petitioner engaged in violent conduct toward his spouse or girlfriend when he was angered. The evidence also established the links between Petitioner's consumption of alcohol and his anger and between his accusations of spousal infidelity and his threats of violence, which were also present in his relationship with Ms. Gaines.

Therefore, the appellate court was not unreasonable in its analysis that the disputed evidence proved an element of the prosecutor's case and that the evidence was highly probative. Thus, the state court reasonably determined the facts in light of

the evidence presented in the state court proceeding.  Petitioner's as-applied due process challenge to § 1109 is DENIED.

Petitioner argues that § 1109 violated his equal protection rights because the statute singles out for unequal treatment individuals who are accused of committing violent offenses against persons with whom they have had a domestic relationship. Petitioner contends that he should be treated like other individuals who are accused of committing violent crimes against non-domestic partners.

Petitioner fails to point to any Supreme Court authority which supports such a theory.  For this reason alone, under AEDPA, Petitioner's claim fails because the state court, in denying this claim, did not unreasonably apply Supreme Court authority.

Furthermore, in Lemay, 260 F.3d at 1030-31, the Ninth Circuit rejected an equal protection claim in regard to Federal Rule of Evidence 414, which, as noted above, is similar to § 1109 but is directed to sex offenders.  The court pointed out that sex offenders are not a suspect class under the Fourteenth Amendment. Id. at 1030.  The court found that "Rule 414 is constitutional if it bears a reasonable relationship to a legitimate governmental interest," that prosecuting crime effectively is a legitimate governmental interest and that Rule 414 furthers that interest by allowing the prosecution to introduce relevant evidence to help convict sex offenders.  Id. at 1031.

Similarly, individuals who commit violent offenses against their domestic partners are not a suspect class.  Thus, § 1109 is constitutional if it bears a reasonable relationship to a

13

legitimate government purpose.   Prosecuting domestic violence
crimes is a legitimate government interest and § 1109 furthers that
interest.   Therefore, § 1109 does not violate Petitioner's equal
protections rights.   Petitioner's Equal Protection claim is DENIED.

II. Instructing Jury with CALJIC No. 2.50.02

Petitioner argues that the jury instructions with respect to
prior acts of domestic violence violated his due process rights
because they allowed the jury to convict him based solely on the
prior acts of domestic violence under a preponderance of the
evidence standard.

A. State Court's Opinion

The state appellate court addressed this claim as follows.

The court instructed on the prior acts of domestic
violence with the 1999 revision of CALJIC No. 2.50.02,
stating in pertinent part: "If you find that the
defendant committed a prior offense involving domestic
violence, you may, but are not required to, infer that
the defendant had a disposition to commit the same or
similar type offenses.  If you find that the defendant
had this disposition you may, but are not required to,
infer that he was likely to commit and did commit the
crimes of which he is accused.  [¶]However, if you find
by a preponderance of the evidence that the defendant
committed a prior crime or crimes involving domestic
violence, that is not sufficient by itself to prove
beyond a reasonable doubt that he committed the charged
offenses.  The weight and significance, if any, are for
you to decide.  [¶]Unless you are otherwise instructed,
you must not consider this evidence for any other
purpose."  The court also instructed with CALJIC No.
2.50.1 on the prosecution's burden to prove any prior
crimes by a preponderance of the evidence and with CALJIC
No. 2.50.2 on the definition of preponderance of the
evidence.

Appellant contends these instructions violated his right
to be convicted of the crime charged based on proof
beyond a reasonable doubt.  In People v. Brown, 77 Cal.
App. 4th 1324, Division Two of this court upheld the
1999 revision of the instruction against a similar
challenge, reasoning that it did not allow the jury to

14

infer that the defendant committed the charged crime
solely from proof that he committed the prior acts of
domestic violence. . . . We  agree with the <u>Brown</u> court's
analysis of CALJIC No. 2.50.02 . . .

Read in their entirety, the trial court's instructions in
the present case emphasized the requirement for proof
beyond a reasonable doubt of the crimes charged.  Both
counsel reminded the jurors of that standard during their
arguments.  We conclude, as did the court in <u>People v.
Brown</u>, 77 Cal. App. 4th at 1335, that there was no
reasonable likelihood the jurors would have misunderstood
the instructions and believed they could convict
appellant solely because they found he had committed
other acts of domestic violence.  Nor was there any
possibility the jurors would have thought they could
convict on a lower standard than proof beyond a
reasonable doubt.

Respondent's Ex. C at 10-11.

   B. Applicable Federal Law

   To obtain federal collateral relief for errors in the jury

charge, a petitioner must show that the ailing instruction by

itself so infected the entire trial that the resulting conviction

violates due process.  <u>Estelle</u>, 502 U.S. at 72; <u>see also</u> <u>Donnelly</u>

<u>v. DeChristoforo</u>, 416 U.S. 637, 643 (1974) ("'[I]t must be

established not merely that the instruction is undesirable,

erroneous or even "universally condemned," but that it violated

some [constitutional right].'").  The instruction may not be judged

in artificial isolation, but must be considered in the context of

the instructions as a whole and the trial record.  <u>Estelle</u>, 502

U.S. at 72.

   C. Analysis

   Petitioner challenges the part of CALJIC 2.50.02 that allows

the jury to infer, from a finding that he committed prior domestic

violence offenses, that he has a disposition to commit more acts of

15

domestic violence and that, from this, an inference can be made that he committed the crime of which he was accused.  However, Petitioner overlooks the fact that this same jury instruction includes the precaution that a finding that Petitioner committed prior crimes of domestic violence is not sufficient to prove beyond a reasonable doubt that he committed the charged offense.

The state appellate court undertook a thorough analysis of CALJIC 2.50.02 and determined that this instruction, together with all the instructions taken as a whole, "emphasized the requirement for proof beyond a reasonable doubt of the crimes charged."  This conclusion is not unreasonable under established Supreme Court precedent.

Furthermore, other courts have also found this jury instruction to be constitutional.  In Smith v. Roe, 232 F. Supp. 2d 1073, 1089 (C.D. Cal. 2002), the court addressed the constitutionality of CALJIC 2.50.02 and found that the precautionary clause cited above reinforced, rather than diluted, the prosecution's burden of proof beyond a reasonable doubt for all the elements of the charged crime.

Moreover, as noted by the appellate court, in Petitioner's case, the jury was provided with other instructions which emphasized the reasonable doubt standard.

Given the foregoing, the state appellate court's conclusion that there was no reasonable likelihood the jurors would have believed they could convict Petitioner on a lower standard of proof than proof beyond a reasonable doubt was not contrary to or an

16

unreasonable application of Supreme Court authority.  Therefore, this claim is DENIED.

III.   Voluntary Manslaughter Instruction

Petitioner claims that his due process rights were violated when the trial court refused his request for jury instructions on voluntary manslaughter based on the theory of heat of passion. Respondent submits that this claim must be denied because it involves only an interpretation of state law.  Alternatively, Respondent argues that the appellate court opinion was not contrary to or an unreasonably application of Supreme Court law.

A. State Court Opinion

Although appellant presented an alibi defense, he requested instructions on voluntary manslaughter upon the ground of sudden quarrel or heat of passion. . . . The court refused to give the instructions, reasoning that there was no substantial evidence of any provocation by Ms. Gaines "other than, perhaps, her plan, her intent to divorce the defendant."  The court stated that even if Ms. Gaines had showed divorce papers to appellant, "it cannot be said that an objective person . . . would be so provoked by seeing divorce papers would lie [sic] into such a heat of passion that would justify giving that manslaughter instruction. . . .

Although a defendant has a constitutional right to have the jury determine every material issue presented by the evidence, a trial court may refuse a defendant's request to instruct on a lesser included offense when there is no substantial evidence to support that instruction. Substantial  evidence is evidence sufficient to deserve consideration by a jury composed of reasonable persons, i.e., evidence that a reasonable jury could find persuasive.  If the evidence is minimal and insubstantial, the court is not required to instruct on its effect.  (citations omitted).

A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of voluntary manslaughter.  A defendant who intentionally and unlawfully kills lacks malice when he or she acts in a "sudden  quarrel or heat of passion."  The defendant's

17

reason must have been actually obscured as a result of a
strong passion aroused by a provocation sufficient to
cause an ordinary person to act rashly or without
deliberation and reflection.  Stated more simply,
"'sudden quarrel or heat of passion'" within the meaning
of Penal Code section 192, subdivision (a), requires
provocation that is sufficient to arouse a reasonable
person.  (citations omitted). . . .

"[I]n a murder case, unless the People's own evidence
suggests that the killing may have been provoked or in
honest response to perceived danger, it is the
defendant's obligation to proffer some showing on these
issues sufficient to raise a reasonable doubt of his
guilt of murder."  When there is no substantial evidence
of provocation that would arouse a reasonable person to
make the kind of attack that occurred, an instruction on
voluntary manslaughter upon a sudden quarrel or heat of
passion is not warranted.  (citations omitted).

This case is not one in which substantial evidence of
provocation and heat of passion exists even though the
defendant claims the killing was accidental.  On the
contrary, appellant denied he had anything to do with the
killing.  What is more important, there was no evidence
that Ms. Gaines did anything at all to provoke appellant
before he stabbed her 28 times.  Appellant acknowledges
that there was no "affirmative showing" of provocation,
but urges that the prosecution's evidence supports the
inference that something may have provoked him that
night.  According to appellant, one possible inference
from the evidence is the following scenario.  He came
home drunk; he and Ms. Gaines argued; she assaulted him
with a knife; in response, he took the knife and killed
her.  First, the bare possibility that the couple may
have argued on the night in question is not a
circumstance sufficiently provocative to trigger a
violent and deadly reaction in a reasonable person.
Furthermore, the speculation that Ms. Gaines initially
attacked appellant with a knife has absolutely no basis
in the evidence.  Speculation is not a sufficient basis
upon which to require the trial court to instruct on a
lesser offense.  There was no evidence, let alone
substantial evidence, to support a reasonable inference
that Ms. Gaines provoked appellant in a manner that would
arouse a reasonable person to make the kind of sudden and
devastating attack that occurred.  Therefore the trial
court properly refused to instruct on voluntary
manslaughter.  (citations omitted)

Respondent's Ex. C at 11-13.

18

1    B. Applicable Federal Law

2        The failure to instruct on lesser-included offenses in a non-

3    capital case does not present a federal constitutional claim.

4    Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000); Windham v.

5    Merkle, 163 F.3d 1092, 1105-06 (9th Cir. 1998).  However, a

6    defendant is entitled to an instruction on any recognized defense

7    for which there exists sufficient evidence for a reasonable jury to

8    find in his or her favor.  Matthews v. United States, 385 U.S. 58,

9    63 (1988); Hopper v. Evans, 456 U.S. 605, 611 (1982).  This ensures

10   that the jury's discretion is focused so that it may convict a

11   defendant only of a crime fairly supported by the evidence.  Id.

12   C. Analysis

13       Although the appellate court only cited California cases as

14   legal precedent, these cases are in accord with the federal

15   authority cited above.  Therefore, the appellate court's ruling was

16   not contrary to established Supreme Court law.

17       Citing People v. Breverman, 19 Cal. 4th 142, 157 (1998) and

18   People v. Barton, 12 Cal. 4th 186, 195 (1995), Petitioner argues

19   that the appellate court erred in finding the necessity for

20   substantial evidence before a heat of passion instruction was

21   warranted.  However, both these cases explained that, although

22   there is a sua sponte duty to instruct on a lesser included

23   offense, the duty does not arise if there is no evidence of the

24   lesser included offense.  Braverman, 19 Cal. 4th at 154, Barton, 12

25   Cal. 4th at 194-95.  Furthermore, in Barton, the court explained

26   that voluntary manslaughter based on heat of passion "closely

27

28                                    19

resembles an affirmative defense (placing on the defendant the burden of producing evidence of facts which, if believed by the jury, will result in the defendant's acquittal of the crime charged)."  Id. at 199; see also People v. Dixon, 32 Cal. App. 4th 1547, 1552 (1995) ("the burden to set forth sufficient evidence of heat of passion . . . rests with the defendant.").  Therefore, Petitioner's cases do not contradict the appellate court's conclusion.

Finally, Petitioner argues that, even though "there was no affirmative showing of provocation, on the other hand, there was no affirmative showing otherwise."  Petition at L.  However, it was Petitioner's burden to produce sufficient subjective evidence of heat of passion and objective evidence of provocation.  Because he failed to do so, the appellate court's finding of facts was not unreasonable.  Therefore, habeas relief on this claim must be DENIED.

IV.  Prosecutorial Misconduct:  Perjured Testimony

Petitioner claims that, at trial, the prosecutor knowingly put on perjured testimony from witnesses Henry Butler and Northern Tyler.  Butler testified that he and Petitioner were friends who often drank alcohol and used crack cocaine together and that it was under these circumstances that Petitioner talked to him of killing Ms. Gaines before her murder.  Tyler testified that he met Petitioner while they were inmates in the county jail, and that Petitioner admitted to him that he had killed Ms. Gaines.

The only state court to address the perjured testimony claim

was the state superior court on Petitioner's habeas request and it

only addressed the claim regarding Butler's testimony.  Because no

state court addressed the merits of Petitioner's claim regarding

Tyler, the Court independently reviews it.

A. State Court Opinion Regarding Butler's Testimony

Specifically, Butler testified at trial that he had been
drinking with Petitioner and used crack cocaine with him,
when in his January 2, 1998 interview with investigators,
Butler said that he had never seen Petitioner using crack
cocaine and he did not know if Petitioner "hangs at bars"
because Butler did not drink.

Although Petitioner states that Butler offered false
testimony at trial, nowhere does he state that he and
Butler did not use cocaine base or drink alcohol
together.  Clearly the statements during the
investigation and the statements at trial are
inconsistent, but nothing provided by Petitioner shows
that it is the trial testimony, as opposed to the
statements to investigators, that is false.  As far as
can be determined by the Court from the information
provided by Petitioner, it is just as likely that Butler
lied in the interview and testified truthfully at trial
as it is that Butler was accurate in the interview and
testified falsely at trial.  Having received no
indication that Butler's trial testimony was false, there
is necessarily no indication that the prosecutor
knowingly used false testimony.  The court declines to
grant relief on this ground.

Petitioner's Ex. C, at 3-4.

B. Applicable Federal Law

When the prosecution obtains a conviction by the use of

testimony which it knows or should know is perjured, such

conviction must be set aside if there is any reasonable likelihood

that the testimony could have affected the judgment of the jury.

United States v. Agurs, 427 U.S. 97, 103 (1976).  The same result

obtains when the prosecutor, although not soliciting false

evidence, allows it to go uncorrected when it appears.  Napue v.

21

Illinois, 360 U.S. 264, 269 (1959). Prosecutors will not be held accountable for discrepancies in testimony where there is no evidence from which to infer prosecutorial misconduct and the fairness of the trial was not materially affected. United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir. 1995).

In sum, to prevail on a claim based on Agurs/Napue, the petitioner must show that (1) the testimony was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material. United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003) (citing Napue, 360 U.S. at 269-71). "Material" means that there is a reasonable likelihood that the false evidence or testimony could have affected the judgment of the jury. Morris v. Ylst, 447 F.3d 735, 743 (9th Cir. 2006).

C. Analysis

    1. Butler

Petitioner argues that the state court's conclusion--that it was impossible to determine whether Butler's pretrial statement or his trial testimony was false--was incorrectly based upon the fact that Petitioner had not introduced evidence that he and Butler did not use cocaine base or drink alcohol together. Petitioner points to the pages of the trial transcript indicating that he testified that he and Butler did not have the kind of relationship where they would sit and drink and talk about personal matters. RT 3369, 3446. Based on the fact that Petitioner's testimony contradicted Butler's testimony, Petitioner concludes that it was clear that

22

Butler's trial testimony was false.

Petitioner's argument, however, overlooks the fact that to establish a claim of prosecutorial misconduct based on the introduction of perjured testimony, he must show that the prosecutor knew that the witness he presented was lying.  The fact that Petitioner's testimony supported Butler's pretrial statements just establishes a dispute of fact; it does not prove that Butler's trial testimony was false.

Therefore, despite Petitioner's trial testimony, all he can point to is that Butler made inconsistent statements.  In a case on point, <u>United State v. Shylock</u>, 962 F.2d 1349, 1364 (9th Cir. 1989), the Ninth Circuit held that witnesses' contradictory stories alone do not prove that the prosecutor knew which story was true or false and that, without this knowledge, the prosecutor could not have knowingly presented perjured testimony.

Therefore, the trial court's opinion was not contrary to or an unreasonable application of federal law.  Habeas relief on this ground is DENIED.

2. Tyler

Petitioner argues that Tyler's testimony was false because his out-of-court taped statements to detectives were inconsistent with his trial testimony.[2]  The inconsistences involve Tyler's testimony

_____

[2]In his September 14, 2006 amended federal petition, Petitioner also contends the perjured testimony claim is based on the fact that he did not tell Tyler any of the things to which Tyler testified. However, Petitioner did not submit this ground for his perjured testimony claim to the state habeas court.  Therefore, this claim is unexhausted.  Furthermore, the Court granted Petitioner leave to return to state court to exhaust only his <u>Brady</u> claim and any new

regarding the knife that was used as a murder weapon and what, if anything, Petitioner did with Ms. Gaines' purse after the murder.

Petitioner's argument regarding Tyler's testimony is the same as the one he made in relation to Butler's testimony.  Although Petitioner presents pre-trial statements that were inconsistent with trial testimony, he does not submit evidence that the prosecutor knew which statement was false.  As discussed above, inconsistent statements alone do not establish prosecutor misconduct.  Also, as with Butler, the fact that Petitioner may support the alleged falsity of Tyler's statements does not prove that they were false or that the prosecutor knew they were false. Therefore, based on an independent review of the record, the Court concludes that the state court's denial of this claim was not contrary to or an unreasonable application of established federal law.  Habeas relief on this ground is DENIED.

V. Ineffective Assistance of Trial and Appellate Counsel

In his habeas petition filed in superior court, Petitioner claimed that his trial counsel was ineffective because he failed to present the taped police interviews of Butler and Tyler at trial as impeachment evidence.[3]  Only in his habeas petition to the

---

claim regarding perjured testimony based upon the evidence of Tyler's state criminal docket.  <u>See</u> March 7, 2006 Order Granting Petitioner's Request to Expand the Record at 5-6.  Therefore, this new ground for relief is dismissed based on the fact that Petitioner was not granted leave to add it to his amended petition.

[3]In his state petition, Petitioner had claimed prosecutorial misconduct, under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), for failing to disclose the taped interviews as exculpatory evidence.  Petitioner does not present this claim in his federal petition because he has learned that the prosecution disclosed the tapes to trial counsel.

California Supreme Court did Petitioner present the claim that appellate counsel was ineffective for failing to argue on direct appeal that trial counsel was ineffective.   The California Supreme Court summarily denied the petition.

A. State Court Opinion

The state superior court's analysis of Petitioner's ineffective assistance of counsel claim in habeas proceedings is intertwined with its analysis of Petitioner's <u>Brady</u> claim because the materiality of the evidence at issue, which the court discussed in regard to the <u>Brady</u> claim, is used by the court in its resolution of the ineffectiveness claim.   Therefore, the state court's analysis of both claims is provided as follows.

> Petitioner contends that the prosecution failed to disclose exculpatory evidence revealed in the taped interviews with witnesses Henry Butler and Northern Tyler.
>
> Only substantial material evidence favorable to the accused need be disclosed.   Evidence is favorable if it helps the defendant or hurts the prosecution, but it is material only if, considering the totality of the circumstances, there is a reasonable probability that, had the evidence been disclosed, the result would have been different.   With respect to Butler's statement to investigators that he did not drink or use cocaine, whether Butler drank or used cocaine is not exculpatory because it is neither favorable to him nor the sort of evidence that, had it been disclosed, would alter the result.   (citations omitted).
>
> Regarding Tyler's statements, none of the evidence identified is at all exculpatory. . . .
>
> Petitioner complains that his attorney, Savas Loukedis, did not present the purportedly exculpatory evidence revealed in the taped statements of Butler and Tyler to the jury, even though it was available to him.
>
> To prove that a defendant has received constitutionally inadequate representation by counsel, he must show that

25

> (1) counsel's representation was deficient, i.e., it fell
> below an objective standard of reasonableness under
> prevailing professional norms; and (2) counsel's
> deficient performance subjected the defendant to
> prejudice, i.e., there is a reasonable probability that
> but for counsel's failings the result would have been
> more favorable to the defendant.  In re Alvernaz, (1991)
> 2 Cal. 4th 937; Strickland v. Washington, (1984) 466 U.S.
> 668, 687-696.

> Petitioner has neither shown that his attorney's failure
> to obtain this evidence fell below the standard of
> reasonableness nor that the result would have been more
> favorable to him in the absence of counsel's failings.
> The taped statements of Tyler and Butler are not
> exculpatory.  Even if they were, it is not reasonably
> probable that Petitioner would not have been convicted of
> the premeditated murder of his wife had they been
> disclosed, given the overwhelming evidence against him.

> Petitioner has therefore not met his burden of showing
> ineffective assistance of counsel.

Petitioner's Ex. C at 4-6.

B. Applicable Federal Law

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance, of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  Id.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things.  First, he must establish that counsel's performance was deficient, that is, it fell below an "objective standard of reasonableness" under prevailing professional norms.  Id. at 687-88.  The relevant

26

inquiry is not what defense counsel could have done, but rather
whether the choices made by defense counsel were reasonable.
Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).  Judicial
scrutiny of counsel's performance must be highly deferential, and a
court must indulge a strong presumption that counsel's conduct
falls within the wide range of reasonable professional assistance.
Strickland, 466 U.S. at 689.  Because trial counsel's competence is
presumed, the petitioner must rebut this presumption by
demonstrating that counsel's performance was unreasonable under
prevailing professional norms and was not the product of sound
strategy.  Id. at 688-89.

Second, a petitioner must establish that he was prejudiced by
counsel's deficient performance, that is, "there is a reasonable
probability that, but for counsel's unprofessional errors, the
result of the proceeding would have been different."  Id. at 694.
A court need not determine whether counsel's performance was
deficient before examining the prejudice suffered as the result of
the alleged deficiencies.  Id. at 697; Williams (Keith) v.
Calderon, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995).

The Due Process Clause of the Fourteenth Amendment guarantees
a criminal defendant the effective assistance of counsel on his
first appeal as of right.  Evitts v. Lucey, 469 U.S. 387, 391-405
(1985).  Claims of ineffective assistance of appellate counsel are
reviewed according to the standard set out in Strickland.  Miller
v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).  A defendant
therefore must show that counsel's advice fell below an objective
standard of reasonableness and that there is a reasonable

probability that, but for appellate counsel's unprofessional errors, he would have prevailed on appeal.  Miller, 882 F.2d at 1434 & n.9 (citing Strickland, 466 U.S. at 688, 694; Birtle, 792 F.2d at 849).

Appellate counsel does not have a constitutional duty to raise every non-frivolous issue requested by the defendant.  Jones v. Barnes, 463 U.S. 745, 751-54 (1983).  The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  Miller, 882 F.2d at 1434.  Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason--because he or she declined to raise a weak issue.  Id.

C. Analysis

Whether the out-of-court statements were exculpatory is relevant to both prongs of the Strickland ineffective assistance analysis.  If the evidence was not exculpatory, counsel's performance cannot be said to be deficient for failing to present it at trial, nor could Petitioner have been prejudiced by counsel's failure to do so.  The state court's opinion on this point was not contrary to or an unreasonable application of established Supreme Court authority.

1. Butler's Out-Of-Court Statement

In regard to the court's factual finding that Butler's out-of-court statement was not exculpatory, Petitioner argues that Butler was the only witness whose testimony gave credence to the prosecution's theory of premeditation and deliberation, and

therefore, impeaching his credibility was essential.  Petitioner
cites Butler's January 2, 1998 police interview, in which he stated
that he had never seen Petitioner using crack cocaine, as strong
impeachment evidence because, at trial, Butler testified that he
drank with Petitioner and saw Petitioner smoke crack cocaine.

A review of the record reveals that counsel did a thorough job
of cross-examining Butler, drawing out his bias against Petitioner
and the contradictions in his testimony.  Butler testified that he
drank beer, RT at 1199, then he testified that he hardly drank
beer, RT at 1201, then he testified that he just had a beer with
Petitioner to be social with him, RT at 1201, 1204.  This
established the contradictions within Butler's own testimony.
Butler testified that almost every time he had a conversation with
Petitioner, he himself was under the influence of cocaine or
alcohol and that he had been convicted of a theft crime and he was
currently on probation.  RT at 1204-07.  This put Butler's
credibility at issue.

Butler's pre-trial statement that he had never seen Petitioner
with crack directly contradicted Butler's trial testimony.  RT at
1208.  However, counsel might have decided it was unwise to call
attention to the issue of whether Petitioner smoked crack cocaine.
Furthermore, whether Butler saw Petitioner using crack or not would
most likely not have changed the result of the jury's verdict.

Therefore, the state court's conclusion that Butler's out-of-
court statements were not exculpatory and, therefore, would not
have affected the jury's verdict was not an unreasonable
determination of the facts in light of the evidence presented in

the state court.  Habeas relief is DENIED on this ground.

> 2. Tyler's Out-of-Court Statement

Petitioner argues that counsel was ineffective for not impeaching Tyler with his inconsistent statements regarding the knife that was used as a murder weapon and Ms. Gaines' purse.

As discussed above, the state habeas court denied this claim on the ground that the prior inconsistent statements were not exculpatory.  This conclusion is not an unreasonable finding of fact in light of the evidence in the record.  Where the knife and the purse were hidden after the murder are minor details in comparison to the thrust of Tyler's testimony that Petitioner told him why and how he killed Ms. Gaines.  Furthermore, as Respondent points out, counsel's decision not to bring out these discrepancies, which would have focused the jury on the details of the murder, was reasonable because counsel's strategy was to discredit Tyler's entire testimony by emphasizing that he had a number of felonies and was benefitting from giving inculpatory testimony against Petitioner by receiving favorable treatment in regard to a pending felony.

Therefore, the state court's denial of this claim was not contrary to or an unreasonable application of established federal law nor was it based on an unreasonable determination of the facts in light of the evidence presented.  Habeas relief on this ground must be denied.

Furthermore, because there was no viable ineffective assistance of counsel claim regarding the impeachment of Butler or

Tyler, appellate counsel was not ineffective for not presenting

this claim in Petitioner's direct appeal.  Thus, the state habeas

court's denial of this claim was not contrary to federal law.

VI. <u>Brady</u> Claim

Petitioner argues that the state habeas court's decision

denying his <u>Brady</u> claim with regard to the prosecution's allegedly

favorable treatment of Tyler is contrary to Supreme Court authority

because "no analysis was undertaken to determine whether the

additional information discovered by Petitioner was (1) evidence,

(2) favorable to the accused, or (3) material to guilt or

punishment."  Petitioner also argues that the state court's

decision was based on an unreasonable determination of the facts in

light of the evidence presented in the state court proceedings.

A. State Court Opinion

The state superior court issued a reasoned decision denying

Petitioner's <u>Brady</u> claim which the court of appeal and the

California Supreme Court affirmed without comment.  The superior

court ruled as follows.

> According to the unpublished appellate decision in this
> case, Northern Tyler testified for the prosecution that
> he met Petitioner in February 1998 while he was in
> custody in the county jail.  Petitioner told Tyler how he
> had killed his wife and stated that he was upset with her
> because she had control over the money.  He also told
> Tyler that his wife "fought for her life, struggling,
> trying to scratch him, and then in a panic, he basically
> stuffed her under the bed to make it look like the
> situation was burglary or whatever, and cleaned up the
> situation and got out."

> Attached as Exhibit 2 to the petition is a copy of a
> letter sent by the prosecutor to Petitioner's defense
> attorney prior to trial regarding deals he made with
> potential witnesses against Petitioner.  The prosecutor

31

indicated that Tyler was charged with felony assault with
a weapons use allegation and an allegation that the
assault inflicted great bodily injury and felony battery
with a weapons use allegation.  The letter also disclosed
that Tyler had suffered impeachment priors including
three counts of robbery (PC § 211) out of Los Angeles
County in 1980.  The prosecutor related that Tyler had
been released on his own recognizance in return for
truthful testimony in Petitioner's case, but that the
release was revoked when Tyler failed to appear and he
was presently back in jail.  The letter further stated
that Tyler "received no other benefit or promise other
than being told that his truthful testimony will be
brought to the attention of the judge in his own case at
the time of sentencing."

Court records attached to the petition as Exhibit 3
indicate that, on July 8, 1999, approximately three weeks
after Petitioner was found guilty, the complaint against
Tyler was amended on the motion of the prosecution to
reduce the assault charge to a misdemeanor pursuant to PC
§ 17, and Tyler pled no contest to that charge.  The
battery charge was dismissed.  Imposition of sentence was
suspended, and Tyler was awarded 2 years probation and
time served.

Petitioner complains that the prosecution violated its
Brady obligations by failing to disclose to the defense
all benefits to Tyler in exchange for his testimony.
Specifically, Petitioner alleges that the prosecution had
a "secret deal" with Tyler, the prosecution's chief
witness, which was concealed from the trial judge, the
jury, and defense counsel. (Petition at 9).  He declares
that he conveyed police theories about the investigation
to Tyler, and then Tyler added to these statements his
own words in order to extricate himself from jail. (Id.
at 11).  Petitioner alleges that Tyler's court records
reflect that he had every reason to fabricate statements
he attributed to Petitioner and that the defense would
have been able to demonstrate this had the inducements
not been concealed. (Id. at 10).  He requests a new
trial.

Petitioner is correct that the DA was required under
Brady v. Maryland, (1963) 373 U.S. 83 to turn over
evidence that a key prosecution witness had been promised
leniency in return for his testimony. (Giglio v. United
States, (1972) 405 U.S. 150, 154).

However, Petitioner has not sufficiently demonstrated
that any secret deal between Tyler and the District
Attorney's Office existed.  Significantly, no strikes

were alleged in Tyler's pending case when the complaint was filed on February 4, 1998 (See Exh. 1), before Tyler even met Petitioner.  Thus, Tyler faced a determinate sentence of a maximum of 7 years, not a 25 to life sentence under the three strikes law, as Petitioner alleges.

Petitioner neither presents declarations from those involved, such as Tyler and the DDA who offered him the deal, nor explains why he could not obtain this or other documentary evidence in support of his claim.  (citations omitted).

"Conclusory allegations made without any explanation of the basis for the allegations do not warrant relief, let alone an evidentiary hearing."  In this case, the only support for Petitioner's claim that the prosecution had a secret deal with Tyler in exchange for his testimony is speculative.  As such, Petitioner has not met his burden to show a prima facie case for relief.  (citations omitted).

Respondent's Ex. J at 1-4.

B. Applicable Federal Law

In <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

"There are three components of a true <u>Brady</u> violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).  The existence of exculpatory evidence cannot be based on mere speculation.  <u>Woods v. Bartholomew</u>, 516 U.S. 1, 6 (1995).

33

1    C. Analysis

2        Petitioner assumed that because Tyler received a favorable

3    plea bargain shortly after Petitioner's conviction, it was the

4    result of a secret deal.  However, the fact that one event occurred

5    shortly after another does not establish that the first event

6    caused the second or vice versa.  There are many factors involved

7    in negotiating a plea bargain, most importantly the strength of the

8    prosecutor's case against the defendant.  Here, there is no

9    evidence about these factors.  Any conclusion that Tyler's plea

10   bargain was the result of his testimony against Petitioner is

11   speculative.  As discussed above, the existence of exculpatory

12   evidence must be based on more than mere speculation.  Thus, the

13   state court's denial of Petitioner's <u>Brady</u> claim was not contrary

14   to or an unreasonable application of Supreme Court authority.  Nor

15   was the state court's finding of facts unreasonable in light of the

16   evidence presented to it.

17       Accordingly, habeas relief cannot be granted to Petitioner on

18   the basis of his <u>Brady</u> claim.

19                              CONCLUSION

20       For the foregoing reasons, Petitioner's petition for a writ of

21   habeas corpus is DENIED and his motion to shorten time is DENIED as

22   moot.  The Clerk shall enter judgment against Petitioner and close

23   the file.  The parties shall bear their own costs.

24            8/12/08

25   Dated _____        _____
                                           CLAUDIA WILKEN
26                                         United States District Judge

27

28                                    34

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

DIXON,                                          Case Number: CV04-03038 CW

         Plaintiff,                             **CERTIFICATE OF SERVICE**

  v.

RUNNELS et al,

         Defendant.
_____/

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on August 12, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Juliet B. Haley
California Attorney Generals Office
455 Golden Gate Avenue
Suite 11000
San Francisco,  CA 94102-7004

Larry  Dixon P-48492
San Quentin State Prison
San Quentin,  CA 94964

Dated: August 12, 2008

                                        Richard W. Wieking, Clerk
                                        By: Sheilah Cahill, Deputy Clerk

35